United States District Court
Southern District of Iowa
Central Division

United States of America,

    Plaintiff,

v.

Eugene J. Cherny and Heartland Plastic & Reconstructive Surgery, P.C.,

    Defendants.

Case 4:26-cv-00257

# Complaint

1. Dr. Eugene J. Cherny, acting by and through his Des Moines plastic-surgery practice, Heartland Plastic and Reconstructive Surgery, P.C., provided false information to a Medicare Administrative Contractor about how much he paid for skin substitute products that he used to treat Medicare beneficiaries. Relying on these false representations, the Government reimbursed Cherny more than $2 million for skin substitute products.

2. The United States brings this action under the False Claims Act, as amended, 31 U.S.C. §§ 3729–33, and under common-law theories of payment by mistake, money had and received, and fraud. In so doing, the United States seeks to recover treble damages and civil penalties and to recover damages incurred by Government healthcare programs.

## Jurisdiction and Venue

3. The Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

4. This district is a proper venue under 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because the defendants transact business in this district.

## Parties

5. Plaintiff, the United States of America, brings this action on behalf of the U.S. Department of Health and Human Services and the

U.S. Department of Defense. As further discussed below, HHS, through its component the Centers for Medicare and Medicaid Services, administers Medicare, and the Department of Defense, through its component Defense Health Agency, administers the Tricare program.

6.  Defendant Cherny is a medical doctor who owns and operates Heartland, a plastic-surgery practice in the Des Moines area. Cherny resides in the Southern District of Iowa.

7.  Defendant Heartland is an Iowa professional corporation with its principal location at 10611 Hickman Road, Des Moines, Iowa. Cherny is the sole owner, President, Director and Shareholder of Heartland.

## Background

### A.  Timeframe

8.  Unless otherwise specified, the allegations in this Complaint concern claims submitted between January 1, 2021, and December 31, 2022.

### B.  False Claims Act

9.  The False Claims Act allows treble damages and civil penalties to be awarded against any person who knowingly causes false or fraudulent claims for payment to be submitted to the United States government. 31 U.S.C. § 3729(a)(1).

10. Civil penalties assessed after June 1, 2019, range from $11,665 – $23,331 per violation.

11. For False Claims Act purposes, a person acts knowingly regarding information if he has actual knowledge of the information or is deliberately ignorant or acts in reckless disregard of the truth or falsity of the information. There is no requirement that the person have a specific intent to defraud. *See* 31 U.S.C. § 3729(b)(1).

### C.  Affected government programs

#### 1.  Medicare

12. In 1965, Congress enacted Medicare—formally, Title XVIII of the Social Security Act—to provide health insurance coverage for people ages 65 or older and for people with certain disabilities or afflictions. Medicare is administered by the Centers for Medicare & Medicaid

Services, or CMS, which is part of HHS. *See* 42 U.S.C. §§ 426 *et seq.*, 426A *et seq.*, 1395 *et seq.*

13. Medicare covers items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Medicare Part B, the portion of the program this case concerns, covers essential outpatient, doctor, and preventative services.

14. CMS contracts with private companies to act as agents in reviewing and paying claims submitted by health care providers. The companies are referred to as Medicare Administrative Contractors. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.200, 421.400. Wisconsin Physicians Service Government Health Administrators was the contractor that administered Part B claims in Iowa.

15. Once a Medicare beneficiary meets his or her deductible, Medicare Part B pays 80% of the Medicare-allowed amount of a claim. 42 U.S.C § 1395l(a)(1). Some Medicare beneficiaries purchase a supplemental insurance product, known as a secondary plan or Medigap plan, to cover the remaining 20% co-pay. Others are responsible for covering that co-pay directly.

16. Once Medicare has processed the claim, it passes the co-pay portion to the beneficiary or secondary payor for payment.

17. For a healthcare provider to seek reimbursement from Medicare, the provider must obtain a National Provider Identifier from CMS. The provider must also submit an enrollment application to the contractor.

18. A participating provider must properly document in the patient's medical record the service or procedure performed.

19. To obtain reimbursement from Medicare, providers submit a claim form, which typically is done electronically. For Part B claims, providers submit CMS Form 1500 or its electronic equivalent, known as the 837P format.

20. The submitted claim form must identify, among other things, the beneficiary and provider, the services provided to the beneficiary, and the products or medications used in the treatment of the beneficiary. *See* Medicare Claims Processing Manual, CMS Pub.100-04, ch. 26.

21. When a provider applies to submit electronic claims, the provider agrees "that it will submit claims that are accurate, complete, and truthful."

22. Once CMS receives a claim, the claim elements are reviewed for validity and coverage. In some instances, contractors may issue a formal request for medical records or other documentation before the claim is allowed to be fully processed. This request is called an Additional Documentation Request.

23. When a contractor requests additional documentation, the provider must submit the necessary documentation or the claim may be denied.

### 2. Tricare

24. Tricare is a healthcare coverage program for active-duty military personnel, military retirees, and military dependents. Tricare is administered by the Defense Health Agency, a component of the Department of Defense. 10 U.S.C. § 1076d; 42 U.S.C. § 1320-7b(f)(1).

25. When an eligible beneficiary has healthcare insurance through Medicare Parts A and B, Tricare acts as a secondary insurer, as described above in Paragraph 15, meaning that it pays for the co-pay portion of the claim.

### D. Skin substitute products

26. Skin substitute products are biologic, synthetic, or biosynthetic materials used to cover or treat certain persistent wounds. Skin substitute products include allografts (human tissue), xenografts (animal tissue), and synthetic tissue products.

27. During the relevant period, Medicare Part B covered skin substitute products applied in a physician's office.

28. When a healthcare provider uses a skin substitute product on a Medicare beneficiary, the provider submits a claim for reimbursement to Medicare through the administrative contractor.

29. The claim includes the applicable code found in the Healthcare Common Procedure Coding System assigned to the skin substitute product used to treat a beneficiary. The claim also includes the number of units of skin substitute product being billed. The number of units

corresponds to the number of square centimeters of the product used to treat a beneficiary.

30. During the relevant period, Medicare Part B reimbursed providers for skin substitute products using one of three methods: average sales price, wholesale acquisition cost, or invoice pricing.

31. Medicare Part B pays for many drugs, biologicals, and other products like skin substitutes using the average sales price methodology. Average sales price reflects the weighted average of sales prices after deducting discounts, rebates, and other price concessions. Manufacturers report average sales price data to CMS after the end of each calendar quarter. CMS uses these data to calculate average-sales-price payment limits on a quarterly basis and then provides a file to each administrative contractor for pricing drugs, biologicals, and other products. *See* 42 C.F.R. § 414.800 *et seq.*; Medicare Claims Processing Manual, CMS Pub. 100-04, ch. 17, § 20.1.2.

32. If CMS does not publish an average sales price-based payment amount, the agency instructs its contractors to determine payment using either wholesale acquisition cost or invoice pricing. *Id.* § 20.1.3.

33. The wholesale acquisition cost is the manufacturer's list price for the product to wholesalers or direct purchasers in the United States, before any prompt-pay or other discounts, rebates, or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data. 42 U.S.C. § 1395w-3a.

34. Manufacturers report the wholesale acquisition cost to a CMS-approved compendium such as the Micromedex Redbook. The administrative contractor accesses the approved compendium to determine the product's wholesale acquisition cost. During the relevant period, Wisconsin Physicians Service used the Micromedex Redbook to determine the wholesale acquisition cost price.

35. Under invoice pricing, an administrative contractor obtains cost information directly from providers and sets a reimbursement amount based on the amount the providers report they paid for the product.

36. There is no regulatory definition of invoice price. But the CMS Provider Reimbursement Manual states that "the true cost of goods and services is the net amount actually paid for the goods or services" and

that "where a discount, allowance, refund, or rebate is received on supplies or services,… it must be used to reduce the total cost of the … services." CMS Pub. 15-1, ch. 8, § 804.

37. Medicare relies on providers and manufacturers to provide accurate pricing information. When payment is made based on the invoice price, a provider is not permitted to submit claims seeking reimbursement for, and cause CMS or an administrative contractor to pay, amounts greater than what the provider actually paid for the goods or services.

## Allegations

### A.  Cherny's use of skin substitute products

38.  Cherny was a prolific user of skin substitute products in treating federal beneficiaries, primarily Medicare patients, following Mohs micrographic surgery, a specialized technique used to remove skin cancer.

39. A Mohs wound can vary in size and depth depending on the location and extent of the cancer.

40. Routine treatments of Mohs wounds include "secondary intention," which means allowing the wound to heal on its own, surgical repairs made to the resulting wound using various surgical supplies (i.e. sutures, staples, etc.), and the surgical application of a skin graft using healthy skin taken from another part of the patient's body. In 2017, a sales representative for a skin substitute product manufacturer introduced Cherny to those products. Before this, Cherny typically treated all Mohs wounds with surgical repairs or skin grafts.

41. During the relevant period, Cherny purchased skin substitute products directly from two manufacturers and one distributor. These products included Affinity, Puraply XT, Artacent, Axolotl, Novafix DL, Microlyte Matrix, and PalinGen.

42. Sales representatives and executives from a skin substitute manufacturer and distributor explained to Cherny that he could benefit from a substantial profit or "spread" if he used the products on Medicare Part B patients. Those representatives stated that the profit or "spread" would result from a Medicare reimbursement that was far higher than the amount that Cherny paid for the product.

43. Cherny closely tracked the profits he made from using skin substitute products and required his staff to maintain a "logbook" that tracked his return on investment. He refused to use a skin substitute product on Medicare Part B patients unless it yielded a significant profit. Cherny frequently asked his staff and manufacturer representatives to figure out which product had the largest "spread"— that paid the most profit—for a specific Medicare Part B patient and then used that product to treat the patient's Mohs wound.

44. Cherny used skin substitute products to treat nearly all of his Medicare Part B patients with Mohs wounds. On the other hand, he used those products to treat only a few of his private-insurance patients with Mohs wounds.

45. The per-patient cost to Medicare for the initial surgical repairs and skin grafts after Mohs procedures in Iowa was on average $445. The per-patient cost to Medicare for the *first* application of a skin substitute by Cherny was on average $13,000, and the per-patient cost to Medicare for a complete course of treatment with skin substitutes by Cherny was on average $57,000.

46. Soon after he first began using skin substitute products to treat Medicare patients' Mohs wounds, Cherny became one of the most prolific billers of skin substitute products in the country. In 2020, Cherny was the nation's top paid Medicare Part B provider of skin substitute products.

47. In 2021, Medicare reimbursed Cherny $13,142,219 for skin substitute products, once again ranking Cherny as the highest-paid Medicare Part B provider for such claims nationwide.

48. In 2022, Medicare reimbursed Cherny $7,025,207 for skin substitute products.

### B. False claims Cherny submitted or caused to be submitted

49. Cherny submitted claims to Medicare Part B using an electronic CMS Form 1500, seeking reimbursement for both the application procedure and the skin substitute product.

50. When submitting each electronic claim to Medicare for payment, Cherny certified, among other things, that the information in his claim was true and accurate and that he was providing the government with sufficient information to make an informed payment decision.

51. On numerous occasions, Wisconsin Physician Services, the administrative contractor, sent Cherny additional documentation requests asking for information on the amounts that he claimed to have paid for skin substitute products. In response, Cherny often provided false information, including invoices reflecting false prices that he never paid.

52. Cherny obtained the false invoices from a skin substitute distributor. The distributor gave Cherny two invoices for each piece of skin substitute product that he purchased. The distributor emailed both invoices to Heartland on the same day.

53. One of the two invoices showed a "list price" for the skin substitute product. Cherny never paid the list price for any of the pieces of skin substitute products. The second invoice reflected the substantially lower price that Cherny actually paid and knew he would pay.

54. Cherny and his Heartland staff communicated with the skin substitute distributor about the purpose of each invoice provided.

55. The first invoice documenting the list price, that is, the price Cherny never paid, was to give to the administrative contractor if it sent Cherny an additional documentation request.

56. As early as July 2020, Cherny was aware of Wisconsin Physician Services's reliance on the invoices in setting the reimbursement amount. He received additional documentation requests for several claims for a skin substitute product, and Wisconsin Physician Services calculated the Medicare-allowed amount for the skin substitute products based on the cost reflected on his submitted invoices.

57. During the relevant period, Heartland received approximately 45 additional documentation requests related to claims for skin substitute products. Each request asked for the invoice that documented the price for the skin substitute product that was the subject of the claim. On each of these occasions, Cherny responded only with the falsified invoice showing the higher price that Cherny did not pay.

### 1. False claims for Novafix

58. For example, in March and June 2021, Wisconsin Physician Services sent Cherny six additional documentation requests related to claims for Novafix. Each one asked Cherny to send "a copy of the invoice

for the service billed under Q4254" (the code for Novafix) on a specific date and for a specific beneficiary.

59. In response, Cherny provided invoices that showed prices of $400 per square centimeter (unit) of Novafix, adding up to $6,400 for each 16-unit (4x4 sq. cm.) piece, $9,600 for each 24-unit (4x6 sq. cm.) piece and $12,800 for each 32-unit (4x8 sq. cm.) piece.

60. Cherny had actually paid $240 per unit, that is $3,840 for each 16-unit piece, $5,760 for each 24-unit piece and $7,680 for each 32-unit piece. Cherny did not disclose this accurate information to Wisconsin Physician Services.

61. Based on Cherny's false representations, Wisconsin Physician Services calculated inaccurate allowed amounts for each claim on which it had requested additional information, namely, $6,400, $9,600, and $12,800, respectively, for each 16-unit, 24-unit and 32-unit piece of Novafix. It also used that false information to calculate an allowed amount for one additional claim for Novafix at the $400 per unit price.

62. Based on the submission of these false invoices, Cherny was paid $18,432 by federal payors.

### 2. False claims for Palingen

63. In May 2022, Cherny received five additional documentation requests seeking copies of the invoices for claims involving Palingen. Each request asked Heartland to send "a copy of the invoice for the service billed under Q4173" (the code for Palingen) for a specific date, and for a specific beneficiary.

64. In response, Cherny sent Wisconsin Physician Services invoices showing he paid $500 per unit, totaling $8,000 for each 16-unit (4x4 sq. cm.) piece and $16,000 for each 32-unit (4x8 sq. cm) piece.

65. Cherny had actually paid $300 per unit, that is $4,800 and $9,600 for each 16-unit and 32-unit piece, respectively. Cherny did not disclose this accurate information to Wisconsin Physician Services.

66. Because of the false information provided by Cherny, Wisconsin Physician Services calculated an allowed amount based on the false invoices, namely $8,000 and $16,000 for each 16-unit and 32-unit piece of Palingen.

67. Based on the submission of these false invoices, Cherny was paid $17,741 by federal payors.

### 3. False claims for Axolotl

68. Between March and October 2022, Cherny received thirty-one additional documentation requests seeking copies of invoices for Axolotl DualGraft. Each request asked Heartland to send, "a copy of the invoice for the service billed under Q4210" (the code for Axolotl) for a specific date, and for a specific beneficiary.

69. Cherny responded with invoices indicating that he had paid $800 per unit, namely $6,400 for each 8-unit (2x4 sq. cm.) piece, $12,800 for each 16-unit (4x4 sq. cm.) piece and $25,600 for each 32-unit (4x8 sq. cm.) piece of Axolotl DualGraft. Cherny had actually paid $480 per unit, that is $3,840 for each 8-unit piece, $7,680 for each 16-unit piece and $15,360 for each 32-unit piece. He did not disclose this accurate information to Wisconsin Physician Services.

70. Because of the false information provided by Cherny, Wisconsin Physician Services calculated an allowed amount based on the false invoices, namely $6,400, $12,800 and $25,600 for each 8-unit piece, 16-unit piece and 32-unit piece of Axolotl, respectively for each claim. It also calculated an allowed amount for 132 additional claims at the $800 per unit price.

71. Based on the submission of these false invoices, Cherny was paid $846,440 by federal payors.

### 4. False claims for Microlyte Matrix

72. In September and October 2022, Cherny received three additional documentation requests seeking copies of invoices for Microlyte Matrix. Each request asked Cherny to send, "a copy of the invoice for the service billed under Q2005" (the code for Microlytle Matrix) for a specific date, and for a specific beneficiary.

73. Cherny responded with invoices indicating he had paid $260 per unit or $6,500 for a 25-unit (5x5 sq. cm.) piece of Microlyte Matrix. Cherny had actually paid $169 per unit ($4,225 for each 25-unit piece). He did not disclose this accurate information to Wisconsin Physician Services.

74. Because of the false information provided by Cherny, Wisconsin Physician Services calculated an allowed amount based on the false invoices, namely $6,500 for each 25-unit piece for each claim. It also calculated an allowed amount for 42 additional claims at the $260 per unit price.

75. Based on the submission of these false invoices Cherny was paid $96,314 by federal payors.

### Reliance and Damages

76. Medicare reasonably relied on Cherny's and Heartland's representations that Cherny had paid the amounts that he reported in the claims and to Wisconsin Physician Services.

77. As a result of the Defendants' false claims, Medicare and Tricare paid Cherny and Heartland claims totaling $2,482,482.[1]

### Prayer for Relief

#### A. Count 1: Presentation of False Claims
#### 31 U.S.C. § 3729(a)(1)(A)

78. As described above, Cherny and Heartland knowingly caused to be presented to Medicare false or fraudulent invoices in response to additional documentation requests that showed inflated or false payment amounts for skin substitute products that were reimbursed by Medicare and Tricare. That conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

79. Payment of the false and fraudulent claims was a reasonable and foreseeable result of Cherny and Heartland's conduct.

80. The United States suffered actual damages because of Cherny and Heartland's wrongful conduct in an amount to be determined at trial and is therefore entitled under the False Claims Act to treble damages plus a civil penalty for each false and fraudulent claim.

---

[1] The billed amount related to these claims totals $3,978,000.

**B. Count 2: Making or Using False Statements Material to a False Claim**
**31 U.S.C. § 3729(a)(1)(B)**

81. As described above, Cherny and Heartland knowingly made, used or caused to be made or used false or fraudulent invoices in response to additional documentation requests that showed inflated or false payment amounts for skin substitute products that were reimbursed by Medicare and Tricare. The fraudulent reimbursement requests and false invoices were material to and were relied on in determining Medicare and Tricare reimbursement for claims for skin substitute products.

82. That conduct constituted knowingly making, using, or causing to be made or used false records or statements that were material to false or fraudulent claims to Medicare and Tricare and thus violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

83. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Cherny and Heartland's statements and actions.

84. Because of Cherny and Heartland's wrongful conduct, the United States suffered actual damages in an amount to be determined at trial and is therefore entitled under the False Claims Act to treble damages plus a civil penalty for each false record or statement material to a false or fraudulent claim.

**C. Count 3: Payment by Mistake**

85. Medicare and Tricare paid Cherny and Heartland based on the mistaken belief that the false and inflated claim amounts and supporting invoices Cherny and Heartland provided to the administrative contractor were accurate. That belief was material to the federal payor's decision to pay.

86. Cherny and Heartland benefitted from the mistaken payments. Accordingly, the payments made based on this material mistaken belief should be returned to the United States.

### D.  Count 4: Money Had and Received

87.  By virtue of the conduct and the acts described above, Cherny and Heartland obtained a benefit at the expense of the United States by fraud, duress, or the taking of unfair advantage.

88.  Allowing Cherny and Heartland to retain this benefit at the expense of the United States would be unjust and unconscionable. Accordingly, Cherny and Heartland should be required to return to the United States the amount of the payments unjustly retained.

### E.  Count 5: Common Law Fraud

89.  Cherny and Heartland knowingly made material and false representations concerning the price of skin substitute products for which they sought reimbursement from Medicare and Tricare with the intention to deceive the United States and with the intention for the United States to act upon such misrepresentations to its detriment. The United States justifiably relied upon Cherny and Heartland's false representations in reimbursing them for skin substitute products.

90.  Cherny and Heartland's false representations caused the United States to make payments it would not have made had Cherny and Heartland made truthful representations.

91.  By reason of these payments, the United States has been damaged in an amount to be determined at trial.

### Prayer

The United States of America respectfully requests that the Court:

a.  Adjudge that the defendants, as alleged in Counts 1 and 2, violated the False Claims Act and award the United States, in accordance with that Act, treble its actual damages and the civil penalties as are required by law;

b.  Decree that the defendants, as alleged in Counts 3 and 4, have been unjustly enriched and award the United States the greatest of the damages it sustained, the amounts by which the defendants were unjustly enriched, or the amounts the defendants illegally retained;

c.  Adjudge that the defendants, as alleged in Count 5, are liable for common-law fraud and award the United States compensatory

13

and punitive damages in an amount to be determined by the factfinder;

d. Adjudge that the United States recover pre- and post-judgment interest, its costs, and its expenses; and

e. Award all other relief as may be just and proper at law and equity.

Dated June __, 2026.

Respectfully submitted,


Respectfully submitted,

DAVID WATERMAN
United States Attorney
Southern District of Iowa


By: */s/ Andrew H. Kahl*


ANDREW H. KAHL
Assistant United States Attorney
Neal Smith Federal Building
210 Walnut Street, Suite 455
Des Moines, IA  50309
Phone: (515) 473-9300
Andrew.Kahl@usdoj.gov

LEIF OLSON
United States Attorney
Northern District of Iowa


By: */s/Brandon J. Gray*


BRANDON J. GRAY
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401
Phone: (319) 363-6333
Fax: (319) 363-1990
Brandon.Gray2@usdoj.gov